# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 10, 2012 Session

## STATE OF TENNESSEE v. BRADLEY SCOTT

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 09-05054, 10-05874      Chris Craft, Judge**

---

**No. W2011-00677-CCA-R3-CD  - Filed May 10, 2012**

---

The defendant, Bradley Scott, was convicted by a Shelby County Criminal Court jury, under two separate indictments, of first degree premeditated murder, first degree felony murder, and two counts of aggravated rape and was sentenced to an effective term of life plus twenty-two years in the Department of Correction.  On appeal, he argues that:  (1) the trial court erred in denying his motions to suppress DNA evidence and the statements given by him to the police; and (2) the evidence is insufficient to support his convictions.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal and at trial) and R. Trent Hall (at trial), Assistant Public Defenders, for the appellant, Bradley Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Alanda H. Dwyer and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The victim was discovered nude and lying facedown in the hallway of her house on December 22, 2008, with a coat hanger looped and twisted around her neck and attached to a door knob.  A rape kit established the defendant's DNA in intact sperm found inside the victim.  The defendant's DNA was also found on a broken piece of marble floor tile used

to beat the victim, as well as on a skull cap found in the hallway.

The DNA from the crime scene was matched to the defendant via the combined national DNA database, CODIS. The defendant first told police he did not know the victim, but, after being confronted with the DNA evidence, told the police he had sex with the victim but that the last time was in late October or early December. The defendant's DNA sample had been entered into the CODIS system when he was arrested the previous year in Tennessee on a fugitive warrant due to his failure to appear in a Mississippi court on an aggravated assault charge. The defendant was indicted on charges of first degree premeditated murder, first degree felony murder, and two counts of aggravated rape.

## Suppression Hearing

Prior to trial, the defendant filed a motion to suppress the DNA evidence and the statements he gave to police. The defendant asserted that his original DNA sample was unlawfully obtained and maintained and that the second DNA sample, given to police upon his arrest, as well as his statements, were "fruit of the poisonous tree" because they arose from the initial CODIS hit and were also involuntary due to sleep deprivation and hunger.

Specifically regarding the DNA/CODIS issue, the defendant argued that: (1) his first DNA sample was taken in contravention of Tennessee Code Annotated section 40-35-321(e)(1) because he was not arrested for the commission of a violent felony, but instead was arrested on a fugitive warrant based on a Mississippi charge of aggravated assault; (2) the taking of his DNA constituted an unreasonable search and seizure because it was taken in contravention of the statute; (3) his DNA was kept in the CODIS system in contravention of Tennessee Code Annotated section 40-35-321(e)(2) after he was acquitted of the Mississippi aggravated assault charge; and (4) the lack of a mechanism in Tennessee Code Annotated section 40-35-321(e)(2) for keeping track of out-of-state charges violates the equal protection clause of the constitution because it cannot be applied equally to persons arrested in Tennessee and tried in Tennessee and those arrested in Tennessee but tried in another state.

The State responded that: (1) the defendant was arrested on a fugitive warrant arising from a Mississippi aggravated assault charge and that aggravated assault is one of the violent felonies which requires DNA sampling from arrestees; (2) the defendant had a prior Mississippi felony conviction for unlawful possession or taking away of a motor vehicle and that Tennessee Code Annotated section 40-35-321 requires that anyone convicted of a felony after July 1, 1998 provide a DNA sample; (3) the State was not required to destroy the DNA sample after the defendant's acquittal on the Mississippi aggravated assault charge because he was a convicted felon; and (4) even if a mistake was made in retaining the

defendant's DNA, Tennessee Code Annotated section 38-6-113(c) provides that any mistake in obtaining a DNA sample did not invalidate a subsequent conviction.

At the suppression hearing, Sergeant William Merritt with the Memphis Police Department testified that he came into contact with the defendant on March 20, 2009, after the defendant was taken into custody and Sergeant Merritt was asked to obtain a saliva sample from him for DNA testing. The defendant, although informing Sergeant Merritt he was aware he was in the homicide office, asked why he had been arrested. Sergeant Merritt told the defendant that he did not know much about the case and had merely been asked to obtain a DNA sample from the defendant. The defendant signed a consent form and gave a sample. He never expressed any reluctance to give a sample and was completely cooperative.

On cross-examination, Sergeant Merritt testified that the defendant was arrested around 2:00 p.m. and it was around 3:15 p.m. when he took the sample from the defendant. He did not know how long it had been since the defendant had last slept or had anything to eat. The defendant did not appear to be under the influence of drugs.

Lieutenant Bart Ragland with the Memphis Police Department testified that he took a statement from the defendant the next day, March 21. The defendant was brought to the interview room from his jail cell and informed of the investigation into the victim's murder. The defendant agreed to talk to the officers and signed an advice of rights form at 3:22 p.m. The defendant never indicated that he did not understand what he was doing, "communicated fine" with the officers, and never indicated that he did not want to talk to them. The defendant gave a statement to the officers, which he started at 5:04 p.m. and signed at 5:21 p.m., denying any sexual relations with the victim or any involvement in the homicide. The defendant told the officers that "his only knowledge of it was from his mother-in-law who lived a few houses down from the victim."

Lieutenant Ragland testified that they took a break, during which the defendant was given a candy bar and allowed to use the restroom, then, around 8:00 p.m., the defendant was confronted with the fact his DNA matched evidence at the scene. The defendant then admitted to having sex with the victim in late October or early December and that he had not told them earlier because he did not want his wife to find out. The defendant denied any recent sexual activity, despite being told that his intact sperm was found in the victim. The defendant expressed no reluctance in giving a statement to the officers, but only that he did not want his second statement reduced to writing because he was worried about his wife finding out. Therefore, Lieutenant Ragland memorialized in his supplement what the defendant had told them. The defendant also never indicated that he was hungry or sleep-deprived.

The twenty-seven-year-old defendant testified that he had a sixth grade education because he dropped out in the seventh grade after failing that grade twice. He acknowledged that he had a January 26, 2001 conviction in Mississippi for unlawful possession of a motor vehicle but said that he was not ordered by the Mississippi court to give a DNA sample. The defendant stated that, sometime in 2008, he was charged with aggravated assault in Mississippi and, after he missed a court date, was arrested on a fugitive warrant in Tennessee. He waived extradition and gave a DNA sample to the Tennessee authorities, then he was extradited to Mississippi where he was eventually acquitted on the aggravated assault charge.

The defendant testified that he was arrested for the instant crime on March 20, 2009, and he gave another buccal swab for DNA testing because the officers told him that they would get a warrant if he did not comply and that would make him look guilty. The next day, he gave two statements, one written and one oral, to the officers. He acknowledged that he signed a waiver of rights but asserted that he was sleep-deprived due to his cocaine addiction and had not had anything to eat since the day before the arrest. He said he was arrested on a Friday and was not taken before a magistrate until Monday.

On cross-examination, the defendant testified that he went to court "once or twice" on his aggravated assault charge in Mississippi before coming to Memphis and being arrested on the fugitive warrant.

The trial court made both oral and written findings in denying the defendant's claims. The court found that: (1) the first DNA sample was properly taken because the defendant's underlying charge was aggravated assault, which is one of the enumerated felonies in Tennessee Code Annotated section 40-35-321(e)(1) and (e)(3) requiring DNA sampling upon arrest; (2) the defendant's DNA sample did not have to be destroyed after his acquittal on the aggravated assault charge per Tennessee Code Annotated section 40-35-321(e)(2) because he had a prior felony conviction; (3) pursuant to the holdings in State v. Cannon, 254 S.W.3d 287 (Tenn. 2008) and State v. Scarborough, 201 S.W.3d 607 (Tenn. 2006), DNA collection is constitutional when reasonable under all of the circumstances; (4) the DNA sample was collected constitutionally and neither Mississippi nor Tennessee was under a duty to destroy it, nor was Mississippi under a duty to tell Tennessee to destroy it; (5) even if Mississippi had a duty to notify Tennessee of the acquittal or Tennessee had a duty to monitor the defendant's Mississippi case, it was reasonable for the authorities to preserve the DNA sample due to the defendant's being a convicted felon; (6) the defendant, at most, suffered a statutory violation, and Tennessee Code Annotated section 38-6-113(c)(1) provided that any mistakes made in taking or retaining DNA samples did not invalidate a conviction. The court also accredited the testimony of the police officers that the defendant's statements were freely and voluntarily given and that the defendant freely and

voluntarily consented to have his second DNA sample taken.

## Trial

## State's Proof

The victim's sister identified a photograph of the victim for the record and said that the victim's son was ten months old when the victim was killed.

The victim's landlord testified that around 10:00 a.m. on December 22, 2008, he went to the victim's house to make sure the heat was working. He saw her car in the driveway and noticed that the front door was ajar about ten inches. He rang the doorbell and, when no one came to the door, he went inside. Once inside, he noticed that the rear door that opened into the kitchen was ajar about ten inches as well. He found the victim's naked body in the hallway with a wire around her neck that was attached to a door knob. He also found the victim's son in the crib in his bedroom at the end of the hall and noticed that the cold water tap in the bathroom was not entirely turned off.

On cross-examination, he testified that there were no signs of forced entry on either of the ajar doors. On redirect, he testified that he did not recall seeing that the floor tile between the hallway and the bathroom was broken because he was very upset, but he said that the bathroom tile had recently been redone and thus any broken tile would had to have happened very recently.

Officer Robert Whipple with the Memphis Police Department testified that he was called to the scene around 11:00 or 11:30 a.m. on December 22, 2008, where he found the victim facedown in the hallway hanging from a doorknob. He saw two pieces of floor tile broken from the entry to the bathroom, with marble dust around the area indicating that the tile had been broken recently. There was also a black cap in the hallway. Officer Whipple retrieved the crying baby from his crib and noted that the door into the baby's bedroom was about three-quarters of the way open.

Sergeant Roger Wheeler, of the Memphis Police Department Crime Scene Unit at the time of the offenses, testified that he photographed, marked, and collected evidence, as well as measured and diagramed the scene.

Officer Charles Cathey with the Memphis Police Department Crime Scene Unit testified that he worked the crime scene with Sergeant Wheeler and that they photographed the scene and tagged evidence. He observed the victim lying in the hallway with a wire coat hanger around her neck that was hanging from a door knob. The victim had bruises on her

back and shoulder and feces on her buttocks. There appeared to be blood on the floor in front of the victim's hands, as well as a spot of blood on the wall in the hallway. Broken bathroom tiles and a black knit cap were found in the hallway. There appeared to be blood on the end of one of the broken tiles. Various pieces of clothing and shoes were found near the victim or in the bathroom. A pink and gray jogging suit was in the bathroom, pulled inside out.

Officer James Max with the Memphis Police Department Homicide Bureau testified that he was the case officer assigned to this case and, as such, controlled the crime scene. A pair of jogging pants, with ladies' panties inside them, was found under the victim's feet after her body was removed. A couple of empty baby bottles were found in the baby's room, which indicated that the baby had recently been fed. The victim's bed appeared as though only one person had slept in it. A metal utility shed in the backyard contained a clothes dryer and, based on the folded and stacked laundry, it appeared that someone had been doing laundry that day.

Officer Max stated that he had Nahum Velasquez, a friend of the victim's baby's father, submit a DNA sample because Velasquez was the only person other than the victim whom the officers knew to have been in the victim's house recently. Velasquez was originally charged with the murder. However, the results of the rape kit performed on the victim cleared Velasquez as a suspect but pointed to the defendant as the perpetrator. They discovered that the defendant's mother-in-law lived two houses away from the victim.

The defendant's mother-in-law testified that her daughter and the defendant lived with her until December 13, 2008, when they moved out to live with the defendant's grandparents. The witness had met the victim and talked with her on one occasion about two weeks before her murder. To her knowledge, the defendant had never met the victim. However, the defendant often went for long walks, lasting "a few hours," in the neighborhood. The defendant was known to wear a skull cap.

Sergeant William Merritt testified that the defendant consented to giving a buccal swab sample for DNA testing on March 20, 2009.

Officer Walter Davidson with the Memphis Police Department testified that he accompanied Officer Max to the scene of the murder and typed a supplement describing the scene. Officer Davidson obtained a DNA sample from Nahum Velasquez per Officer Max's request.

Investigator Tim Helldorfer with the Shelby County District Attorney's Office testified that he went to the area of the victim's house to take photographs in preparation for

trial. The victim's backyard was visible from that of the defendant's mother-in-law. Helldorfer determined that the latch on the victim's wrought-iron front security door did not close securely. The shed behind the victim's home contained a washer, dryer, and refrigerator. He tried to locate Nahum Velasquez to testify at trial but was unable to find him. On cross-examination, Helldorfer acknowledged that the photographs he took of the area were taken approximately twenty-one months after the murder.

Lieutenant Ragland testified that he took a formal written statement and then an oral statement from the defendant. In his first statement, the defendant said that he did not have a relationship with the victim and had only waved at her in passing. After a break, Lieutenant Ragland informed the defendant that his DNA had been found in the victim. The defendant then changed his story and admitted that he had sex with the victim twice, once in September and once in October or early December, but he did not have any contact with her around the date of her murder. The defendant did not want to reduce his second statement to writing.

Dr. Lisa Funte, a medical examiner with the Shelby County Regional Forensic Center, testified that she recovered the victim's body from the crime scene and conducted the autopsy of the victim. The victim had bruises and abrasions on her body, some of which exhibited a pattern consistent in width with the broken piece of floor tile. The bruises were consistent with having been inflicted at or near the time of death.

Dr. Funte testified that drag marks on the floor indicated that the victim had been dragged from the living room into the hallway and noted that there was a pair of sweatpants stuck under the victim's leg. There were smears of feces consistent with dragging as well. Dr. Funte noted that the types of injuries sustained by the victim, as well as a fear response, could have caused her to defecate. The fact that there was urine in the toilet and "nicely folded" toilet paper nearby suggested to Dr. Funte that the victim possibly could have been interrupted while using the bathroom.

Dr. Funte testified that the victim was hung from a door knob with a wire coat hanger that had been twisted several times around her neck. The autopsy revealed a combination of ligature strangulation and blunt force trauma as the cause of death. Dr. Funte surmised that "the blunt force trauma to the head, most likely came, prior to her being hanged from the door knob. So the blunt force assault[] probably l[ed] to her altered mental status and then she was hanged from the door knob." The doctor noted that the victim's skull showed three distinct bruises, meaning she was hit at least three times, consistent with the size of the bathroom floor tile. Dr. Funte also collected a rape kit on the victim, collecting swabs of the victim's vaginal, oral, and anal areas.

Special Agent Donna Nelson, a forensic scientist with the Tennessee Bureau of Investigation ("TBI") Serology and DNA Unit, testified that she analyzed evidence in the victim's case. Agent Nelson tested the evidence obtained in the rape kit and determined that there were two DNA contributors, the victim and an unknown male contributor not matching any of the possible suspects to date, to the samples taken from the victim's vaginal and oral areas. Agent Nelson noted that sperm degrade over time but that the samples in this case contained both heads and tails. As such, she determined that, given the number of intact sperm, the sperm had been deposited within twenty-four hours of her death. The sample of the unknown contributor was entered into the CODIS database, and it returned with a match to the defendant. Agent Nelson later tested a saliva standard received from the defendant and confirmed that the defendant was the unknown male contributor to the DNA from the vaginal swabs. She noted that sperm tended to break down faster in the oral cavities but that the defendant could not be excluded as the contributor to the DNA from the oral swabs of the victim.

Agent Nelson testified that she tested the blood on the broken bathroom tile, and it matched the victim's DNA. The defendant's DNA was found on the opposite end of the tile. Agent Nelson also tested the skull cap found at the scene and determined that the defendant's DNA was on it as well.

## Defendant's Proof

The defendant first acknowledged having a car theft conviction in Mississippi and having lied in both of his statements to the police. He admitted that he had sex with the victim and explained that he had originally lied to Lieutenant Ragland because he did not want his wife to find out he had slept with another woman. He said that he finally admitted to the officers that he had sex with the victim but lied to them about the number of times he had done so. He also admitted that, contrary to his statement to police, he last had sex with the victim the morning of her death. However, he denied killing the victim. He admitted that he told his grandmother, "I'm about to lose my life, over having sex with another woman."

After the conclusion of the proof, the jury convicted the defendant, as charged, of first degree premeditated murder, first degree felony murder, and two counts of aggravated rape. The murder convictions and rape convictions, respectively, were merged, and the defendant was sentenced to an effective term of life plus twenty-two years imprisonment.

## ANALYSIS

## I. Motions to Suppress

The defendant argues that the trial court erred in denying his motions to suppress the DNA evidence and his statements to the police. When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S .W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

## A. First DNA Sample

The defendant first asserts that the trial court erred in denying his motion to suppress the DNA evidence, arguing that his first DNA sample was illegally obtained when he was arrested on a fugitive warrant from the State of Mississippi in violation of both the statute as well as the constitution as an unreasonable search and seizure, his sample was illegally maintained following his acquittal on the Mississippi charge, and the Tennessee DNA collection statute violates the equal protection clause of the constitution.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). When it is "reasonable under the circumstances," warrantless DNA sampling of incarcerated prisoners, though considered a search, is constitutional. See State v. Scarborough, 201 S.W.3d 607, 616-622 (Tenn. 2006).

Two Tennessee statutes are relevant to the defendant's claims. First, Tennessee Code Annotated section 40-35-321 provides, in pertinent part:

> (a) As used in this section, unless the context otherwise requires, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes.

. . . .

(d)(1) When a court sentences a person convicted of any felony offense committed on or after July 1, 1998, or any misdemeanor offense, the conviction for which requires the defendant to register as a sexual offender pursuant to chapter 39, part 2 of this title, on or after July 1, 2007, it shall order the person to provide a biological specimen for the purpose of DNA analysis as defined in subsection (a). If the person is not incarcerated at the time of sentencing, the order shall require the person to report to the county or district health department, which shall gather the specimen. If the person is incarcerated at the time of sentencing, the order shall require the chief administrative officer of the institution of incarceration to designate a qualified person to gather the specimen. The biological specimen shall be forwarded by the approved agency or entity collecting the specimen to the Tennessee bureau of investigation, which shall maintain it as provided in § 38-6-113. The court shall make the providing of the specimen a condition of probation or community correction if either is granted.

(2) If a person convicted of any felony offense or any applicable misdemeanor offense and committed to the custody of the commissioner of correction for a term of imprisonment or sentenced to a period of confinement in a county jail or workhouse has not provided a biological specimen for the purpose of DNA analysis as defined in subsection (a), the commissioner or the chief administrative officer of a local jail may order the person to provide a biological specimen for the purpose of DNA analysis before completion of the person's term of imprisonment. The biological specimen shall be forwarded by the approved agency or entity collecting the specimen to the Tennessee bureau of investigation, which shall maintain it as provided in § 38-6-113.

(e)(1) When a person is arrested on or after January 1, 2008, for the commission of a violent felony as defined in subdivision (e)(3), the person shall have a biological specimen taken for the purpose of DNA analysis to determine identification characteristics specific to the person as defined in subsection (a). After a determination by a magistrate or a grand jury that probable cause exists for the arrest, but prior to the person's release from custody, the arresting authority shall take the sample using a buccal swab collection kit for DNA testing. The biological specimen shall be collected by the arresting authority in accordance with the uniform procedures established by the Tennessee bureau of investigation, pursuant to § 38-6-113 and shall be forwarded by the arresting authority to the Tennessee bureau of investigation,

-10-

which shall maintain the sample as provided in § 38-6-113. The court or magistrate shall make the provision of a specimen a condition of the person's release on bond or recognizance if bond or recognizance is granted.

(2) The clerk of the court in which the charges against a person described in subdivision (e)(1) are disposed of shall notify the Tennessee bureau of investigation of final disposition of the criminal proceedings. If the charge for which the sample was taken is dismissed or the defendant is acquitted at trial, then the bureau shall destroy the sample and all records of the sample; provided, that there is no other pending qualifying warrant or capias for an arrest or felony conviction that would otherwise require that the sample remain in the data bank.

(3) As used in this subsection (e), "violent felony" means:

. . . .

(C) Aggravated assault[.]

Id. § 40-35-321(a), (d), and (e).

The other relevant statute is Tennessee Code Annotated section 38-6-113(c)(1), which provides:

(c)(1) The bureau shall adopt uniform procedures to maintain, preserve and analyze human biological specimens for DNA. The bureau shall establish a centralized system to cross-reference data obtained from DNA analysis. The centralized system shall contain convicted felon profiles, forensic unknown profiles, criminal suspect profiles, violent juvenile sexual offender profiles, and missing person profiles. The detention, arrest or conviction of a person based upon a databank match or database information is not invalidated, if it is later determined that the specimens or samples were obtained or placed in the database by mistake.

Id.

As detailed above, the trial court denied the defendant's motion to suppress, finding that a sample of the defendant's DNA was lawfully taken because the defendant was arrested on a fugitive warrant in Tennessee based on a Mississippi aggravated assault charge, and section 40-35-321(e)(1) and (3) authorized collection of a DNA sample when a person was

-11-

arrested for aggravated assault. The defendant disputes the trial court's finding on two fronts: he was actually arrested on a fugitive warrant and not for a violent offense, and there was no probable cause finding as required by section 40-35-321(e)(1). The defendant asserts that, in addition to a statutory violation, these two deficiencies show that his DNA sample was taken in violation of his right to be free of unreasonable searches and seizures.

After review, we conclude that a sample of the defendant's DNA was properly taken in accordance with the statute. The defendant's underlying offense was aggravated assault, one of the enumerated violent felonies in the statute. Tenn. Code Ann. § 40-35-321(e)(3)(C). Obviously, fugitive from justice is not a substantive crime. See State v. Hughes, 229 N.W.2d 655, 671 (Wis. 1975); David Raybin, 9 Tennessee Criminal Practice and Procedure, § 2:2 (2011). It was the defendant's alleged commission of the aggravated assault that led to his being a wanted individual in Tennessee. The fugitive warrant was merely the vehicle by which he was captured. In sum, the aggravated assault was the underlying reason for the defendant's arrest.

As to the defendant's contention that there was no probable cause finding on the violent felony as required by section 40-35-321(e)(1), we note that Tennessee Code Annotated section 40-9-103 provides:

> Whenever any person within this state is charged on the oath of any credible person before any judge or other magistrate of this state with the commission of a crime in any other state, and, except in cases arising under § 40-9-113, with having fled from justice; or whenever a complaint has been made before any judge or other magistrate in this state setting forth on the affidavit of any credible person in another state that a crime has been committed in that other state and that the accused has been charged in that other state with the commission of the crime, and, except in cases arising under § 40-9-113, has fled therefrom and is believed to have been found in this state, the judge or magistrate shall issue a warrant directed to the sheriff of the county in which the oath or complaint is filed directing the sheriff to apprehend the person charged, wherever the person may be found in this state, and bring the person before the issuing judge or magistrate or any other judge, court or magistrate who may be conveniently accessible to the place where the arrest may be made, to answer the charge or complaint and affidavit. A certified copy of the sworn charge or complaint and affidavit upon which the warrant is issued shall be attached to the warrant.

Id.

As explained in Raybin's <u>Tennessee Criminal Practice and Procedure</u>:

> Under the first sentence of T.C.A. § 40-9-103, the affidavit of complaint must allege, at minimum, that the affiant has probable cause for believing: (1) the defendant is charged with the commission of an offense in another state, (2) what the charge is (e.g. warrant for murder, indictment for rape), and (3) that the person fled the state.

Raybin, § 2:2. Accordingly, in order for the fugitive warrant to have issued in Tennessee, there had to have been proof that the defendant was charged with the commission of aggravated assault in Mississippi. In order for Mississippi to have charged the defendant, there had to have been a showing of probable cause.[1] <u>See</u> <u>Stevenson v. State</u>, 244 So. 2d 30, 33 (Miss. 1971) (stating that "[a]n indictment by a grand jury is a determination that probable cause does exist to hold the person indicted for trial"). Thus, the defendant's contention that there was no finding of probable cause on the aggravated assault charge is without merit.

Having determined the statutory compliance with the sampling of the defendant's DNA, we turn to his allegation that his DNA sample was taken in violation of his right to be free of unreasonable searches and seizures. As noted above, the defendant's claim of an unreasonable search and seizure is based on, as was his statutory argument, his assertion that he "was not arrested for any offense for which the statute gives authority for [DNA sampling]" and that there was not a finding of probable cause on the aggravated assault charge. The defendant does not contest the constitutionality of the DNA sampling statute, rather he asserts that the sampling of his DNA was unconstitutional because it was not done in accordance with the statute. Given our conclusion that the defendant's DNA was sampled in compliance with the statute and that there had been a probable cause determination made in his case, we need not address the defendant's assertion that the sampling constituted an unconstitutional search and seizure. It is not necessary for a court to address a constitutional issue if the resolution of the issue is not "absolutely necessary to determining the issues in the case and adjudicating the rights of the parties." <u>State v. Taylor</u>, 70 S.W.3d 717, 720 (Tenn. 2002) (citing <u>Owens v. State</u>, 908 S.W.2d 923, 926 (Tenn. 1995)).

With regard to the retention of his DNA in the system, the defendant argues that: (1) because he was acquitted on the aggravated assault charge in Mississippi after a trial, the DNA sample taken upon his arrest in Tennessee should have been destroyed pursuant to

---

[1] The defendant acknowledged at the suppression hearing that he attended one or two court dates on his pending aggravated assault case before he stopped going, leading to his eventual arrest on the fugitive warrant.

Tennessee Code Annotated section 40-35-321(e)(2), which provides for destruction of DNA samples upon acquittal; and (2) the lack of any mechanism in Tennessee Code Annotated section 40-35-321(e)(2) for keeping track of the status of out-of-state charges violates his rights under the equal protection clause because it cannot be applied equally to persons arrested in Tennessee and tried in Tennessee and those arrested in Tennessee but tried in another state.

The court did not reach the equal protection issue because it found that the issue was a statutory, not constitutional, matter. The court found that: (1) it was reasonable under the circumstances for the TBI to retain the defendant's DNA record, having not been notified by the Mississippi clerk of the defendant's acquittal; (2) the Mississippi clerk had no duty to follow a Tennessee statute and therefore no duty to notify the TBI of the defendant's acquittal; (3) even assuming the Mississippi clerk had a duty to notify the TBI or the TBI had a duty to constantly inquire of the Mississippi clerk the status of the defendant's case, it was reasonable under the circumstances to retain the defendant's DNA sample pursuant to Tennessee Code Annotated section 40-35-321(d) because the defendant was a convicted felon, having previously been convicted of car theft; and (4) Tennessee Code Annotated section 38-6-113(c)(1) provides that a defendant's detention, arrest, and conviction based on a databank match are not invalidated if it is later determined that the sample was obtained or placed in the database by mistake.

Upon review, we conclude that we need not determine whether the trial court was correct in its finding that the defendant's DNA was properly retained in the CODIS database as he was a convicted felon because Tennessee Code Annotated section 38-6-113(c)(1) is clear that any erroneous obtaining or placing in the database does not invalidate the defendant's arrest and conviction based on such databank match.

As stated above, with regard to his equal protection claim, the defendant argues that the lack of any mechanism in Tennessee Code Annotated section 40-35-321(e)(2) for keeping track of the status of out-of-state charges violates his rights under the equal protection clause because it cannot be applied equally to persons arrested in Tennessee and tried in Tennessee and those arrested in Tennessee but tried in another state.

Both the United States and Tennessee Constitutions guarantee citizens the equal protection of the laws. Brown v. Campbell County Bd. of Educ., 915 S.W.2d 407, 412 (Tenn. 1995), cert. denied, 517 U.S. 1222 (1996); State v. Tester, 879 S.W.2d 823, 828 (Tenn. 1994). "Equal protection requires that all persons in similar circumstances be treated alike[.]" State v. Smoky Mountain Secrets, Inc., 937 S.W.2d 905, 912 (Tenn. 1996). "A defendant in a criminal proceeding who asserts an equal protection violation must prove (1) the existence of purposeful discrimination and (2) that this purposeful discrimination had

a discriminatory effect on him or her." State v. Banks, 271 S.W.3d 90, 155 (Tenn. 2008) (citing McCleskey v. Kemp, 481 U.S. 279, 292 (1987); State v. Irick, 762 S.W.2d 121, 129 (Tenn. 1988)).

The defendant has failed to prove the existence of any purposeful discrimination in the statute. Nothing in the statute evidences any legislative intent to make distinctions regarding notification of dismissals or acquittals. In fact, the plain language of the statute requires the clerk, without differentiation, to notify the TBI of the final disposition of the criminal proceedings. Thus, the statute is neutral on its face and, as to its effects, the defendant's situation is not different than that of a Tennessee arrestee who is subsequently acquitted but, for some reason, the court clerk fails to notify the TBI of the acquittal and who likewise has no recourse under the statute. The defendant's claim that the statute violates the equal protection clause is without merit.

### B. Second DNA Sample and Statements to Police

The defendant argues that his second DNA sample as well as his statements to police were "fruit of the poisonous tree" and subject to the exclusionary rule because they derived from the original sampling and maintaining of his DNA contrary to the statute. He additionally asserts that his statements were made under "coercive" circumstances and that he was not taken before a magistrate within forty-eight hours.

As to the defendant's first contention that his second DNA sample and statements to police should be excluded as flowing from the first DNA sample, such contention is without merit as we have already concluded that the taking of the first DNA sample was proper. In addition, it appears that the defendant voluntarily consented to give his second DNA sample. Sergeant Merritt testified at the suppression hearing that he told the defendant he had been asked to obtain a DNA sample, and the defendant signed a consent form and gave a sample. Sergeant Merritt recalled that the defendant never expressed any reluctance to give a sample and was completely cooperative. The defendant testified that he gave the sample because the officers told him that they would get a warrant if he did not comply and that would make him look guilty. However, the trial court accredited Sergeant Merritt's testimony in finding that the defendant's second DNA sample was constitutionally obtained by consent.

We turn next to the defendant's assertions regarding the "coercive" circumstances in which he made his statements and the timeliness in which he was brought before a magistrate. The defendant claims that the circumstances were coercive because he had been in custody for twenty-six hours and had not eaten or slept. With regard to the length of time before he was taken before a magistrate for a judicial determination of probable cause, the defendant points out that he was arrested on Friday, March 20, 2009, and not taken before

-15-

the magistrate until Monday, March 23, 2009.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

In ruling on this issue, the trial court noted that the defendant testified that, when he was arrested, he had not eaten since the previous day or slept for a couple of days due to constant cocaine use. However, the court accredited the testimony of Lieutenant Bart Ragland that the defendant was given something to eat and never indicated that he was hungry or sleep deprived. As such, the court concluded that the defendant's statements were freely and voluntarily given after he had been advised of, and waived, his Miranda rights. This court will not second-guess the trial court's credibility findings on appeal, see Odom, 928 S.W.2d at 23, and nothing in the record preponderates against the trial court's findings.

With regard to the timeliness in which he was brought before a magistrate, we note that a judicial determination of probable cause that occurs within forty-eight hours of a defendant's arrest is generally sufficient to satisfy the Fourth Amendment, unless there is evidence that the probable cause determination was unreasonably delayed for the purpose of gathering additional information to justify an arrest, was motivated by ill will toward the defendant, or constituted a "'delay for delay's sake.'" State v. Huddleston, 924 S.W.2d 666, 672 (Tenn. 1996) (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991)). "[I]f the statement was given prior to the time the detention ripened into a constitutional

violation, it is not the product of the illegality and should not be suppressed." Id. at 675.

According to the defendant's own recitation of the facts in his motion to suppress and the testimony at the suppression hearing, the defendant was arrested on March 20, 2009 at 1:40 p.m. and kept in the jail until the next afternoon when he was taken to the police department for questioning and ultimately gave his statements around 5:00 p.m., well within the time frame before the detention ripened into a constitutional violation. Therefore, he is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

The defendant argues that without the evidence of the DNA tests and the statements he made as a result of those tests, the evidence in the case is insufficient to support the verdicts of guilty. He seemingly acknowledges that there is sufficient proof of the victim's rape and murder; he only disputes the sufficiency of the proof of his identity as the perpetrator in the absence of DNA evidence.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As we concluded above, the defendant's DNA evidence and statements were properly admitted in this case. The medical proof established that the victim had a number of the defendant's viable sperm in her vagina, which had to have been deposited close to the time of the crimes. The defendant's DNA was also found on the broken bathroom tile that was used to batter the victim, as well as on a skull cap found at the scene. The victim, who was found with a wire coat hanger noose around her neck suspended from a door knob, died from a combination of strangulation and blunt force trauma to the head. Accordingly, the proof was sufficient for the jury to conclude that the defendant raped and killed the victim.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE